Matter of B.F. v Administration for Children's Servs. (2025 NY Slip Op 03393)

Matter of B.F. v Administration for Children's Servs.

2025 NY Slip Op 03393

Decided on June 05, 2025

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: June 05, 2025

Before: Renwick, P.J., González, Rodriguez, Higgitt, Rosado, JJ. 

Docket No. NA-06074/21 NA-11365/22|Appeal No. 3350-3350A|Case No. 2023-05047|

[*1]In the Matter of B.F. and Another, Children Under the Age of Eighteen Years, etc., Roberto R., et al., Respondents-Appellants,
v
Administration for Children's Services, Petitioner-Respondent.
In the Matter of R.E Also Known as R.R., A Child Under Eighteen Years of Age, etc., Roberto R., et al., Respondents-Appellants, Administration for Children's Services, Petitioner-Respondent.

Steven P. Forbes, Huntington, for Roberto R., appellant.
Law office of Brian Greenberg, LLC, New York (Bryan Greenberg of counsel), for Sade E., appellant.
Muriel Goode-Trufant, Corporation Counsel, New York (Jennifer Lerner of counsel), for respondent.
Law Office of Thomas R. Villecco, P.C., New York (Thomas R. Villecco of counsel), attorney for the child B.F.
Donna C. Chin, New York, attorney for the child R.E also known as R.R.

Order of disposition, Family Court, Bronx County (Cynthia Lopez, J.), entered on or about October 6, 2023, to the extent it brings up for review a fact-finding order, same court and Justice, entered on or about the same date, which, after a hearing, found that respondent-appellant Roberto R. abused the child B.F., a child for whom he was legally responsible, and derivatively abused the child R.R., and that respondent-appellant Sade E. neglected the child R.R., affirmed, without costs. Appeals from fact-finding order, unanimously dismissed, without costs, as subsumed in the appeals from the order of disposition.
This case arises from allegations that, in December 2019, B.F. (born on March 7, 2010) was sexually abused by respondent-appellant Roberto R. (Roberto), the live-in boyfriend of B.F.'s mother. The Administration for Children's Services (ACS) commenced a child protective proceeding against Roberto. ACS commenced separate child protective proceedings against Roberto and Sade E. (Sade), the parents of child R.R. (R.R.), based on the abuse of B.F. and Sade's failure to protect R.R. from Roberto. R.R. was born on January 14, 2020, approximately one month after B.F.'s alleged abuse.
Family Court conducted a fact-finding hearing over several days. B.F. testified that Roberto lived with her and her mother for approximately five months. She stated that during the time they lived together, she and Roberto would "always talk to each other" and grew "very close." One night in December 2019, B.F. sat between her mother and Roberto on the pull-out couch and watched television. While B.F.'s mother was half asleep, Roberto touched the inner "sides" of B.F.'s crotch area. He eventually pulled her underwear, reached underneath, and touched her vagina. B.F. testified that she was "shocked" because she believed that she and Roberto had a good relationship. Afterwards, her mother woke up, and she told her mother that Roberto had touched her. Her mother reported the incident to the police two days later.
B.F.'s mother testified that Roberto moved in a week after they started dating. Roberto came home around 6:00 p.m. and left around 7:00 a.m. for work. Roberto contributed $100 every week for rent, bills, and home expenses. The mother confirmed that B.F. took her to the bathroom and told her that Roberto touched her thigh and vagina. B.F. further told her mother that she feared Roberto because he threatened her and said he had "friends" that lived on the block. In January 2020, B.F. sought therapy at the Child Center of New York. There, she was diagnosed with post-traumatic stress disorder because she constantly thought of Roberto sexually abusing her and became startled and hypervigilant around men.
The court credited the testimony of B.F. and her mother, which established that Roberto resided in the home for five months prior to the abuse. In a fact-finding order issued after the hearing, Family Court determined that Roberto was a "person legally responsible[*2]" for B.F.
Conversely, the court discredited Roberto's testimony because it was inconsistent as to his relationship with B.F.'s mother and the frequency of contact with B.F. The court drew a negative inference against Sade, based on her failure to testify. The evidence thus established that Roberto sexually abused B.F. in December of 2019. The court further found that Roberto derivatively abused his child, R.R., because his sexual abuse of B.F. — whose mother was present in the same room — demonstrated a parental judgment so flawed as to create imminent risk of harm to R.R.
A fair preponderance of the evidence supports Family Court's conclusion that Roberto sexually abused B.F. (see Family Court Act §§ 1012[e][iii]; 1046[b][i]). B.F.'s testimony established that Roberto touched her thigh and genital area both over and under her clothing. There is no basis to disturb Family Court's credibility determinations, which are entitled to deference (see Matter of Irene O., 38 NY2d 776, 777 [1975]; Matter of C.F. [Carlos F.], 220 AD3d 506, 506-507 [1st Dept 2023], lv denied 41 NY3d 901 [2024]). The court properly found that B.F.'s uncertainty as to the exact date of the abuse did not undermine her credibility, given the passage of time and her age, demeanor, and recollection of the details of the event (see Matter of Kylani R. [Kyreem B.], 93 AD3d 556, 557 [1st Dept 2012]). Moreover, other evidence, such as the date of the initial investigation by ACS, corroborates the timeline.
Family Court providently exercised its discretion in finding that Roberto was a person legally responsible for B.F. within the meaning of the Family Court Act (see Family Court Act § 1012[g]; Matter of Trenasia J. [Frank J.], 25 NY3d 1001, 1003 [2015]; Matter of Yolanda D., 88 NY2d 790, 796-797 [1996]). Under the Family Court Act, a proper respondent in an article 10 proceeding is a person alleged to have abused or neglected a child, including "any parent or other person legally responsible for a child's care" (Family Court Act § 1012[a]). A person legally responsible is broadly defined as "the child's custodian, guardian, [or] any other person responsible for the child's care at the relevant time" (Family Court Act § 1012[g]). The term "custodian" "may include any person continually or at regular intervals found in the same household as the child when the conduct of such person causes or contributes to the abuse or neglect of the child" (id.).
The phrase "person legally responsible" does not embrace persons with only "fleeting or temporary care of a child such as a supervisor of a play-date or an overnight visitor or those persons who provide extended daily care of children in institutional settings, such as teachers" (Yolanda D., 88 NY2d at 796). Nonetheless, a person who acts as the "functional equivalent of a parent in a familial or household setting" may be deemed to be a person legally responsible (Yolanda D., 88 NY2d at 796). The definition "expressly encompasses paramours [*3]who regularly participate in the family setting and who therefore share to some degree in the supervisory responsibility for the children" (Matter of Gary J. [Engerys J.], 154 AD3d 939, 941 [2d Dept 2017], quoting Matter of Bianca M., 282 AD2d 536 [2d Dept 2001]).
The determination of whether a particular person has acted as the functional equivalent of a parent is a "fact-intensive inquiry which will vary according to the particular circumstances of each case" (Yolanda D., 88 NY2d at 796). Factors to consider include "(1) 'the frequency and nature of the contact,' (2) 'the nature and extent of the control exercised by the respondent over the child's environment,' (3) 'the duration of the respondent's contact with the child,' and (4) 'the respondent's relationship to the child's parent(s)'" (Trenasia J., 25 NY3d at 1004, quoting Yolanda D., 88 NY2d at 796). These factors "are not meant to be exhaustive, but merely illustrate some of the salient considerations in making an appropriate determination" (Yolanda D.,88 NY2d at 796). The weight given to each factor depends on the facts and circumstances of the case (see id.).
As the dissent concedes, the first and third Yolanda D. factors weigh in favor of finding Roberto a person legally responsible for B.F. The credible testimony of B.F. and her mother established that Roberto lived with them for five months prior to the abuse. The fact that he was primarily in the home after work is inconsequential, given B.F.'s testimony that the two were "very close," "always talk(ed) to each other," and played around, leading B.F. to be "shocked" when Roberto sexually assaulted her. The sexual abuse took place while she, her mother, and Roberto were on the pull-out couch [FN1] in the living room watching television at night — a familial activity. The overall nature of their relationship over the span of five months supports "an inference of substantial familiarity" between B.F. and Roberto (Matter of Christopher W., 299 AD2d 268, 268 [1st Dept 2002]).
The second and fourth factors also weigh in favor of finding that Roberto is a person legally responsible for B.F. As to the second factor, B.F. feared Roberto because he threatened her and said he had "friends" that lived on the block, thus evidencing that he exercised control over B.F. Even if the threats do not fit squarely into the second factor, they were properly considered by the court in finding that Roberto was a person legally responsible for B.F., as the Yolanda D. factors are non-exhaustive and may be given differing weight according to the facts and circumstances of the case (see Yolanda D.,88 NY2d at 796).
As to the fourth factor, a parent's cohabitant or romantic partner may qualify as a person legally responsible for a child's care (see Matter of Joel O. [Yvonne O.], 93 AD3d 491, 491-492 [1st Dept 2012]). This is the case even where the partner does not spend every night in the home (see Matter of Mikayla U., 266 AD2d 747 [3d Dept 1999]; Matter of Nichole [*4]SS., 296 AD2d 618 [3d Dept 2002]). Here, Roberto was the mother's boyfriend, who lived with the family for a period of five months and contributed $100 a week towards family expenses (see Matter of Keniya G., 144 AD3d 532, 533 [1st Dept 2016]). These circumstances readily support a finding of familial relationship sufficient to determine that Roberto was a person legally responsible for B.F. (see Trenasia J., 25 NY3d at 1006).
The dissent's narrow interpretation of the statute is inconsistent with its purpose. Article 10's stated purpose is to "help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being. It is designed to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of the parent on behalf of a child so that [the child's] needs are properly met" (Family Court Act § 1011). The protections afforded by Family Court Act § 1012(a) and (g) recognize that "parenting functions are not always performed by a parent but may be discharged by other persons, including custodians, guardians and paramours, who perform caretaking duties commonly associated with parents" (Yolanda D.,88 NY2d at 795).[FN2]
The term "person legally responsible" is meant to be broad, as it encompasses persons continually or regularly found in the same household as the child. A broad interpretation of the statute is vital so children, such as B.F., receive the same protection as children in two-parent family units. In this case, the relevant factors support Family Court's determination that Roberto acted as the functional equivalent of a parent towards B.F. during the relevant time period (see Trenasia J., 25 NY3d at 1006; Yolanda D., 88 NY2d at 797). Family Court thus providently exercised its discretion in finding that Roberto was a person legally responsible for B.F. within the meaning of the Family Court Act.[FN3]
Relatedly, with respect to R.R., the child of Roberto and Sade, a finding of derivative abuse or neglect was proper where "the evidence as to the directly abused or neglected child demonstrate(d) such an impaired level of parental judgment as to create a substantial risk of harm for any child in [Roberto's] care" (Matter of Vincent M., 193 AD2d 398, 404 [1st Dept 1993]). Given the serious nature of Roberto's actions, which involved sexually abusing B.F. in the presence of her mother, Family Court properly found that Roberto derivatively abused his biological child R.R., even though R.R. was not yet born when the abuse of B.F. occurred (see Matter of J.L. [J.A.L.], 228 AD3d 474, 474 [1st Dept 2024]; Kylani R., 93 AD3d at 557).
A preponderance of the evidence also supports the finding that Sade neglected her child R.R. Based on the medical records, as well as a negative inference against Sade based on her failure to testify, Family Court found that R.R. was present when Sade displayed erratic, paranoid, and hostile behavior during a hospital visit [*5]that resulted in an overnight stay and evaluation in a psychiatric emergency department. The court properly determined that Sade's behavior during the hospital visit fell below a minimum degree of care, thus placing R.R., her child, in imminent risk of physical, mental,
emotional harm (see Family Court Act §§ 1012[f][i], 1046[b][i]; Matter of Shanai W. [Sherry P.], 212 AD3d 447, 448 [1st Dept 2023]).
We have considered the remaining contentions and find them unavailing.
All concur except Rodriguez, J. and Rosado, JJ. who dissent in part in a memorandum by Rodriguez, J. as follows:

RODRIGUEZ, J. (dissenting in part),
 

I dissent from that portion of the majority's decision affirming Family Court's finding that respondent Roberto R. was a "person legally responsible" (PLR) for the child B.F. (see Family Court Act § 1012 [g]).[FN4]
The following facts are gleaned from the testimony taken at the fact-finding hearing.[FN5] B.F. stated that Roberto, her mother's boyfriend, lived with them for around five months, coming home at night and leaving in the morning for work. B.F. slept in the bedroom, and her mother and Roberto slept in the living room on a pull-out couch bed. B.F. described her initial relationship with Roberto as not close, but friendly. B.F. stated that when he first moved in, she and respondent "were cool with each other, we like would play around together, we were okay." Roberto never took her to or brought her home from school, never took her to doctor's appointments, never attended school events, and never disciplined her.
When the abuse occurred, B.F., her mother, and Roberto were watching television together on the pull-out couch. By then it had been a few months since Roberto moved in, and the two were "very close" and would "always talk to each other." B.F. was shocked when the abuse occurred because she and respondent had a "good relationship," and she "didn't think that he would do anything like that." B.F. further stated that her relationship with respondent was "like a good friendship," and "[respondent] was like a brother[,] like if I had a brother that's how I would be with him." The two never did any activities together.
The mother testified that she dated Roberto for around five months. Roberto moved in a week after they started dating. He came home at around 6:00 p.m., and he left for work around 7:00 a.m., before B.F. got up for school. The three never ate dinner as a family, and Roberto never bought anything for B.F. or disciplined her. The mother never left B.F. home alone with Roberto. While Roberto had no responsibilities in the home, he gave the mother $100 every week for rent, bills, and home expenses such as soap and dishes. The mother sometimes used that money to purchase clothes for herself, but never for B.F.
In a proceeding under Family Court Act article 10, a "person [who] acts as the functional equivalent of a parent in a familial or household setting," will be deemed a "personal legally responsible" for [*6]the child's care (Matter of Yolanda D., 88 NY2d 790, 796 [1996]; see Family Court Act § 1012 [g]). The non-exhaustive list of factors we must weigh when determining whether a person acts as "the functional equivalent of a parent" are "[1] the frequency and nature of the contact between the child and respondent, [2] the nature and extent of the control exercised by the respondent over the child's environment, [3] the duration of the respondent's contact with the child, and [4] the respondent's relationship to the child's parent(s)" (Matter of Yolanda D., 88 NY2d at 796). Although Family Court Act article 10 is properly applied to a parent's functional equivalent, it "should not be construed to include persons who assume fleeting or temporary care of a child such as a supervisor of a play-date or an overnight visitor or those persons who provide extended daily care of children in institutional settings, such as teachers" (id.). The determination of whether a respondent is properly found to be a PLR involves, above all, "a discretionary, fact-intensive inquiry which will vary according to the particular circumstances of each case" (id.). Ultimately, "[t]he weight to be accorded each factor will, of course, be dependent on the circumstances of the particular case" (id.).
As to the first and third factors—namely, "the frequency and nature of the contact between the child and respondent" and "the duration of the respondent's contact with the child"—here, Roberto and B.F. interacted mostly at night for the five-month period Roberto resided in the household. B.F. testified that she had a "good relationship" with respondent, and the two were "very close" and would "always talk to each other." Additionally, although respondent, B.F., and the mother did not eat meals or do activities outside the home together, they spent time together, as evidenced by the fact that the abuse occurred while the three were watching television. The total contacts between respondent and B.F. were therefore "significant" (Matter of Trenasia J. [Frank J.], 25 NY3d 1001, 1005 [2015]), and these two factors weigh in favor of finding respondent to be a PLR.
The other two factors, however, militate against such a finding. With respect to the fourth factor, "the respondent's relationship to the child's parent," Roberto and the mother first met and dated for about a week prior to Roberto moving in, and they do not share any children in common (cf. Matter of Chance R. [Andre W.], 168 AD3d 554, 554 [1st Dept 2019] [father of children's half-sibling]; Matter of Jaiden M. [Jeffrey R.], 165 AD3d 571, 571 [1st Dept 2018] [father of child's two younger half-siblings]; Matter of Samantha M., 56 AD3d 299, 301 [1st Dept 2008] [father of child's unborn half-sibling]; Matter of Gary J. [Engerys J.], 154 AD3d 939, 940 [2d Dept 2017] [father of children's half-siblings, who also resided in the home]; see also Matter of Trenasia J. [Frank J.], 25 NY3d at 1006 ["Although the existence of a familial relationship [*7]is not dispositive, it is appropriately considered in determining whether a respondent is a PLR"]).
More importantly here, the second factor of "the nature and extent of the control exercised by the respondent over the child's environment" weighs heavily against finding respondent to be a PLR. Respondent did not exercise control over B.F.'s household to any appreciable degree (cf. Trenasia J. [Frank J.], 25 NY3d at 1005 ["As to 'the nature and extent of the control exercised by the respondent over the child's environment,' this incident occurred in Frank J.'s home during an overnight visit, and he was the only adult present at the time"]; Matter of Maridas A. [Paula A.], 204 AD3d 511, 512 [1st Dept 2022] [while supervising child in mother's absence, the respondent, among other things, fed and disciplined the child]; Matter of Tony C. [Kristine S.—Jadiel L.], 226 AD3d 1008, 1010 [2d Dept 2024] ["the evidence demonstrated that the respondent exercised control over the children's environment during the relevant period by freely accessing the children's home on a regular basis while caring for them when the mother was not at home"]; Matter of Gary J. [Engerys J.], 154 AD3d at 941 ["the respondent exercised control over the older children, supervising them when the mother was not present, mediating arguments between the siblings, and disciplining them"]).
Significantly, respondent never took on supervisory responsibility of B.F. (cf. Trenasia J. [Frank J.], 25 NY3d at 1005 [abuse occurred during an overnight visit when the respondent was the only adult home]; Yolanda D., 88 NY2d at 797 [child stayed overnight out of state at the respondent's home without her mother]; Matter of I.M. [R.L.], 233 AD3d 544, 545 [1st Dept 2024] [the respondent picked child up from school for years and watched her until stepfather returned]; Matter of Maridas A. [Paula A.], 204 AD3d at 512 [mother routinely left child in the respondent's care]; Matter of Deandre C. [Luis D.], 169 AD3d 609, 610 [1st Dept 2019] [the respondent watched children after school]; Matter of Ja'Dore G. [Cannily G.], 169 AD3d 544, 545 [1st Dept 2019] [child visited the respondent grandparents every other weekend, often spending the night]; Matter of Jayline R. [Jose M.], 110 AD3d 419, 420 [1st Dept 2013] [the respondent picked children up from school and cared for them during the day, while mother worked]; Matter of Keoni Daquan A. [Brandon W.—April A.], 91 AD3d 414, 415 [1st Dept 2012] [the respondent watched the children]; Matter of Christopher W., 299 AD2d 268 [1st Dept 2002] [child stayed at the respondent's house overnight]; Matter of Tony C. [Kristine S.—Jadiel L.], 226 AD3d at 1010 [the respondent cared for children when mother was not home]; Matter of Erica H.-J. [Tarel H.—Eric J.], 216 AD3d 954, 957-958 [2d Dept 2023] [the respondent father left child with respondent girlfriend for approximately 30 to 60 minutes]; Matter of Serenity R. [Truman C.], 215 AD3d 854, 856 [2d Dept 2023] [the respondent [*8]would assist in watching child]; Matter of Isabella E. [James E.], 195 AD3d 1096, 1097-1098 [3d Dept 2021] [the respondent babysat children while living in basement of home]; Gary J. [Engerys J.], 154 AD3d at 941 [the respondent supervised children when mother was not present]; Matter of Mackenzie P.G. [Tiffany P.], 148 AD3d 1015, 1017 [2d Dept 2017] [the respondent watched child when mother was at school]). Indeed, the mother never left B.F. alone with respondent (see Matter of Shaun B., 55 AD3d 301, 301 [1st Dept 2008] ["The child was never left in respondent's sole care and was at all times in the care of her father"]). Further, the abuse occurred while B.F.'s mother was asleep in the same room.
Crucially, there is no testimony to suggest that respondent ever cared for B.F. or that he assumed any parental duties (see Matter of Mariah B. [Nigel M.], 178 AD3d 622, 622 [1st Dept 2019]), such as cooking for or feeding B.F. (see Maridas A. [Paula A.], 204 AD3d at 512; Matter of Deandre C. [Luis D.], 169 AD3d at 610; Matter of Angelo P. [Jose C.], 98 AD3d 908, 908 [1st Dept 2012]; Matter of Serenity R. [Truman C.], 215 AD3d at 856; Matter of Mackenzie P.G. [Tiffany P.], 148 AD3d at 1017), helping with homework (see Deandre C. [Luis D.], 169 AD3d at 610; Matter of Keoni Daquan A. [Brandon W.—April A.], 91 AD3d at 415; Tony C. [Kristine S.—Jadiel L.], 226 AD3d at 1010), attending doctor's appointments (see Keoni Daquan A. [Brandon W.—April A.], 91 AD3d at 415), disciplining B.F. (see Maridas A. [Paula A.], 204 AD3d at 512; Matter of Chance R. [Andre W.], 168 AD3d at 554), taking or picking her up from school (see Matter of I.M. [R.L.], 233 AD3d at 545; Chance R. [Andre W.], 168 AD3d at 554; Matter of Adam C. [Charles R.], 167 AD3d 487, 488 [1st Dept 2018]; Matter of Kevin N. [Richard D.], 113 AD3d 524, 524 [1st Dept 2014]; Matter of Jayline R. [Jose M.], 110 AD3d at 420; Matter of Samantha M., 56 AD3d at 301),[FN6] or doing activities outside the home with her (Matter of Alisha A. [Nelson V.], 172 AD3d 403, 403-404 [1st Dept 2019] [the respondent arranged family outing with child and his then-girlfriend and her family]; Matter of Jaiden M. [Jeffrey R.], 165 AD3d at 572 [the respondent arranged for eldest child to spend weekends with him]; Matter of Alexandria X. [Ronald X.], 80 AD3d 1096, 1098 [3d Dept 2011] [took child shopping]).
There is similarly no testimony to suggest that respondent and B.F. referred to one another as parent and child, respectively, or characterized their relationship in equivalent terms (see Matter of Alisha A. [Nelson V.], 172 AD3d at 403 [the respondent held child out as his daughter]; Matter of Adam C. [Charles R.], 167 AD3d at 488 [child referred to the respondent as "stepfather"]; Jaiden M. [Jeffrey R.], 165 AD3d at 572 [the respondent considered child to be his son and child referred to respondent as "daddy"]; Matter of Lesli R. [Luis R.], 138 AD3d 488, 488 [1st Dept 2016] [children referred to as the respondent's stepdaughters[*9]]; Matter of Kevin N. [Richard D.], 113 AD3d at 524 [the respondent described himself as child's stepfather]; Jayline R. [Jose M.], 110 AD3d at 420 [the respondent referred to himself as a father figure to the children and held himself out as their caregiver]; Tony C. [Kristine S.—Jadiel L.], 226 AD3d at 1010 [the respondent "testified that, at one point, the children called him daddy, he saw the children as '[his] own kids,' and the children gave him presents for Father's Day"]; Matter of Erica H.-J. [Tarel H.—Eric J.], 216 AD3d at 957 [the respondent testified that she "treated [subject child] like if she was [her] child"]). To the contrary, B.F. testified that the relationship was more akin to that of siblings.
Other than the $100 weekly contribution to the household for rent and household items, respondent did not financially provide for B.F. (see Jaiden M. [Jeffrey R.], 165 AD3d at 572). Further, this indirect and limited financial assistance does not demonstrate that respondent meaningfully "contributed to the functioning of the household of which" B.F. was a part (Matter of Keniya G. [Avery P.], 144 AD3d 532, 533 [1st Dept 2016] [the respondent, who was found to be a personal legally responsible for the child, contributed to household by preparing meals, cleaning the home, grocery shopping and providing financial assistance]). It is undisputed that respondent had no responsibilities in the home and that the mother covered all household expenses except for the $100 weekly contribution.
With respect to this second factor, the presence of every circumstance described in the case law denoting control over a child's environment is of course not required for a respondent to be properly deemed a PLR. The absence of every circumstance, however, casts serious doubt upon the majority's determination that the record supports Family Court's PLR finding.[FN7] Importantly, the fact that respondent lived in the same household as B.F. for five months is not dispositive (see Matter of Zulena G. [Regilio K.], 175 AD3d 678, 680 [2d Dept 2019]; Matter of Kameron V. [Eva V.—Jamel L.], 153 AD3d 1623 [4th Dept 2017]; Matter of Austin JJ, 232 AD2d 736 [3d Dept 1996]) and, under these circumstances, respondent's months-long residence is insufficient to establish that he was a PLR for B.F. This is so even considering respondent's $100 weekly contribution to the home and frequent contact with B.F during the relevant time period.
The majority's conclusion that Roberto is a PLR is likewise unsupported by precedent specifically addressing relatively nascent relationships or cohabitation. For example, in Matter of Samantha M.,this Court held that the respondent—who had resided in the household as the mother's boyfriend for approximately three months prior to the child's hospitalization—was a PLR (56 AD3d at 301). The respondent, however, "was the father of [the child's] unborn half sibling, picked [the child] up from daycare[,] and took care of [the child]," and he therefore [*10]"acted as the functional equivalent of a parent in the household" (id.). Moreover, in Matter of Jayline R. (Jose M.), the respondent resided in the household as the mother's boyfriend for about nine months (110 AD3d at 420). He was determined to be a PLR, as he "picked the children up from school and cared for them during the day, while the mother worked," "described himself as a father figure to the children, and held himself out as the children's babysitter or caregiver so as to be able to stay with them during the time when the family lived in a shelter" (id.).
Here, the record fails to provide such additional support for the conclusion that respondent is a PLR for B.F. Although the relevant time periods are similar, unlike the respondent in Matter of Samantha M., Roberto did not take care of B.F. Matter of Jayline R. (Jose M.) is distinguishable for essentially the same reasons: Roberto was never alone with B.F., was not tasked with her care or supervision, and did not take on any typical parental responsibilities, such as monitoring that B.F. make it to and from school safely or ensuring she was fed (see also Matter of Serenity R. [Truman C.],215 AD3d at 856 [mother's boyfriend determined to be PLR based on pattern of assisting in watching and cooking for the child, notwithstanding only two months of cohabitation]).
In addition, Roberto did not exercise control over B.F.'s environment, was never left alone with her, and did not discipline her (cf. Matter of Rebecca X.,18 AD3d 896, 898 [3d Dept 2005] [mother's boyfriend proper PLR where he lived "with all three children from January through June 2002, was occasionally left alone with them and disciplined them when necessary"]). There is also no testimony in the record that Roberto ever purchased food or groceries for B.F., or that he held himself out as her parent (cf. Matter of Isaiah L. [Chris B.],119 AD3d 797, 799 [2d Dept 2014] [mother's boyfriend proper PLR where he "assumed parental responsibilities . . . , including purchasing food and feeding the child, sleeping in the same bed as the child and the mother, and even representing himself to caseworkers as the child's parent," notwithstanding only one month of cohabitation]). Moreover, respondent, the mother, and B.F. never ate dinner together as a family (cf. Matter of Jamaal NN.,61 AD3d 1056, 1057 [3d Dept 2009] [paramour proper PLR where "neighbor stated that she ate dinner every night with the mother, child and respondent," and the respondent "was sometimes left alone with the child and previously disciplined him on several occasions, even when the mother was present"]).
Accordingly, in my view, a PLR finding is proper when supported by more than the physical proximity of cohabitation and the attendant contacts naturally arising therefrom (cf. Matter of Tyler MM. [Stephanie NN.], 82 AD3d 1374, 1375 [3d Dept 2011] [the respondent properly found to be PLR where "he had daily contact with the children since he had lived in the home [*11]for about a year as the mother's paramour, he was often alone with the children, and there was proof that he cooked, cleaned and helped the children prepare for school]). The majority's decision, on the other hand, would support a PLR finding for any non-parent who resides with a child despite never performing a traditional parental function; never caring for or supervising the child; never being tasked with any responsibility for the child by the parent; never exercising control over the child's environment; and never even being left alone with the child.
The other cases relied on by the majority (Matter of Keniya G. [Avery P.] and Matter of Christopher W.) and Family Court (Matter of Gary J. [Engerys J.]) do not compel a different result. In Matter of Keniya G. (Avery P.), as noted above, the respondent "contributed to the functioning of the household of which [the child] was a part" "by taking [the younger children] to school and picking them up, preparing meals, cleaning the home, preparing the children's clothing, grocery shopping, and providing financial assistance to the household" (144 AD3d 532, 533 [1st Dept 2016]). Here, respondent did not contribute to the home to nearly the same extent. Additionally, unlike here, the child in Matter of Christopher W. was visiting respondent's home and staying overnight at the time of the abuse (299 AD2d 268, 268 [1st Dept 2002]). The record also permitted "an inference of substantial familiarity between the child and respondent and respondent's own children" (id.). Lastly, in Matter of Gary J. (Engerys J.), the respondent was the father of the older children's half-siblings, and he exercised control over the older children by supervising them, mediating arguments between the siblings, and disciplining them (154 AD3d 939, 941 [2d Dept 2017]). Here, respondent never supervised B.F. and not once was around the child in the mother's absence.
Ultimately, the appropriate PLR inquiry is not whether respondent and the subject child became familiar with one another during the period of respondent's residence in the subject child's household. As noted, though the significance of the relationship is one of several factors to be considered (see Yolanda D., 88 NY2d at 796 [PLR analysis to consider, among other things, "the frequency and nature of the contact between the child and respondent"]), the critical issue is instead whether, during the five months at issue here, respondent "serve[d] as the functional equivalent of [a] parent" (id. at 795).
In this regard, Matter of Zulena G. (Regilio K.) bears the greatest resemblance to the instant facts. There, the Second Department held that the Family Court erred in determining that the respondent, who was the subject children's cousin—and lived with them for some time in their grandmother's apartment along with, among others, the children's mother, father, aunt, uncle, and grandmother—was a PLR for the children (175 AD3d at 680-681). Among other things, this was due [*12]to the children's mother's testimony that she never made the respondent responsible for the children, and she did not leave the children alone with him, even when she was not home (id. at 680). Furthermore, although there was evidence that the respondent contributed money to the shared household and had "performed general household chores for the benefit of the entire family, these circumstances were outweighed by evidence that the [respondent] did not exercise control over the children's environment in a manner commensurate with that of a parent" (id. at 680-681).[FN8]
Similarly, here, respondent's residence in the household for five months, significant contacts with B.F. during that time, and contribution of $100 per week for rent and household expenses are substantially outweighed by circumstances demonstrating that respondent was not a PLR. Specifically, respondent did not exercise any control over B.F.'s environment, and he did not assume any parental responsibilities such as supervision, financial support, attendance at doctor's appointments or school functions, cooking, or discipline, nor did he contribute in any other meaningful way to the household of which B.F. was a part.
Finally, the majority's discussion of the statute's purpose underscores its conclusion's lack of textual and case support. By including "other person legally responsible" in Family Court Act § 1012 (a)'s definition of "[r]espondent," the legislature has already recognized that "parenting functions are not always performed by the parent" (Yolanda, D., 88 NY2d at 795). The legislature has therefore addressed the majority's concern that "children, such as B.F., receive the same protection as children in two-parent family units." Notwithstanding this recognition, proper respondents in child protective proceedings are nevertheless limited to parents or others who "perform caretaking duties commonly associated with parents" (Yolanda, D., 88 NY2d at 795). As demonstrated at length herein, the record establishes that Roberto did not "serve as the functional equivalent of [B.F's] parent[]" (id.).
In addition, although the majority correctly notes that a PLR can encompass "persons continually or regularly found in the same household as the child," such persons must nevertheless provide care to the child that is "analogous to parenting" (Yolanda, D., 88 NY2d at 796; see id. ["the care given the child must be analogous to parenting and occur in a household or 'family' setting" (emphasis added)]). Further, "the common thread running through the various categories of persons legally responsible for a child's care [i.e., Family Court Act § 1012 (a), (g)] is that these persons serve as the functional equivalent of parents" (id. at 795). Ultimately, that standard was not met here, and the majority's conclusion thus lacks support from both the statutory language and Court of Appeals' precedent.
The majority characterizes my view as inconsistent with the statute's purpose. On the contrary[*13], in concluding that Roberto—who did not take on a single caretaking responsibility—is not a PLR for B.F., I merely seek to avoid an extra-statutory expansion of Family Court's subject matter jurisdiction (see e.g. Matter of Johna M.S. v Russell E.S., 10 NY3d 364, 366 [2008] ["Family Court is a court of limited jurisdiction that cannot exercise powers beyond those granted to it by statute"]; see also e.g. Matter of Lisa T. v King E.T., 30 NY3d 548, 552 [2017] ["the clearest indicator of legislative intent is the statutory text"]).[FN9]
Because respondent's conduct vis-À-vis B.F. cannot fairly be characterized as anything resembling parenting, I conclude that respondent never served as the functional equivalent of a parent and is thus not a proper PLR as to her. I accordingly dissent in part.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: June 5, 2025

Footnotes

Footnote 1: B.F. slept in the bedroom. Her mother and Roberto slept on the couch.

Footnote 2: Yolanda D.'s reference to care that is "analogous to parenting" (88 NY2d at 796) exemplifies the flexible approach endorsed by the Court of Appeals with respect to "other persons legally responsible." 

Footnote 3: This case illustrates the practical implication of "person legally responsible" status under the aegis of Article 10 of the Family Court Act. Pursuant to its finding that Roberto was a person legally responsible who sexually abused B.F., the court barred Roberto from further contact with the child. A permanent order of protection may be available, under different standards, in criminal or family offense proceedings.

Footnote 4: Although I conclude that Family Court improperly found respondent to be a PLR for B.F., and thus that the abuse finding with respect to her was error (see Matter of R./C. Children, 303 AD2d 172, 172 [1st Dept 2003]; Matter of Zulena G. [Regilio K.], 175 AD3d 678, 681 [2d Dept 2019]), I agree with the majority that Family Court's finding of derivative abuse as to R.R. was proper (see Matter of Trenasia J. [Frank J.], 25 NY3d 1001, 1010 [2015] [Rivera, J., concurring in part and dissenting in part] ["the Appellate Division erroneously affirmed the finding that Frank J. was a person legally responsible for the child's care within the meaning of section 1012 (g), and I would reverse as related to the petition alleging attempted abuse of the child. With respect to the petitions concerning Frank J.'s three children, I agree with the majority that the Appellate Division properly affirmed Family Court's derivative neglect determination"; "The fact that Frank J. does not meet the statutory definition of a PLR concerning the care of another child does not foreclose the agency from proceeding against him with respect to his own"]; see also Matter of Kole HH., 61 AD3d 1049, 1052-1053 [3d Dept 2009], lv dismissed 12 NY3d 898 [2009]).

Footnote 5: Family Court largely discredited Roberto's testimony except as to the timeline he met and dated B.F.'s mother. Family Court further found B.F. credible and gave great weight to her testimony, which to B.F.'s credit was taken when she was just twelve years old. I agree with the majority that there is no basis to disturb Family Court's credibility determinations. The facts recounted and relied upon here are thus taken from the mother and B.F.'s testimony.

Footnote 6: The mother testified that B.F. walked home from school. Nevertheless, there is no testimony that Roberto was responsible for ensuring that B.F. made it to and back home from school safely, which is a typical parental responsibility. Instead, the mother testified that she purchased a phone for B.F. so that B.F. could keep in contact with her while B.F. walked home alone from school.

Footnote 7: The majority concludes that Roberto exercised control over B.F.'s environment because he threatened her and said he had "friends" that lived on the block. The mother's testimony regarding threats, upon which the majority relies, was elicited through a series of questions concerning the abuse at issue. In context, the questioning and the mother's testimony strongly suggest that respondent's threat to the child occurred in the immediate wake of the abuse. The threats thus related not to the exercise of any parental authority but, rather, an attempt to intimidate a victim and prevent disclosure of their abuse. It goes without saying that this latter purpose is flatly unconnected to parental responsibility or to "caretaking duties commonly associated with parents" (Yolanda D., 88 NY2d at 795). Above all, however, this circumstance does not outweigh the evidence that demonstrated Roberto did not exercise control over B.F.'s environment.

Footnote 8: To be sure, the dynamics in Zulena G. (Regilio K.) are not identical to those in the present case inasmuch as the respondent there was the subject children's cousin and "numerous" adults and children lived in the home (175 AD3d at 680). Here, respondent was the mother's boyfriend, and the mother, B.F., and respondent were the only people living in the home during the relevant period. Nonetheless, much like the respondent in Zulena G. (Regilio K.),respondent here was never responsible for B.F., and B.F.'s mother never left her alone with him when she was away from the home.

Footnote 9: Despite the majority's observation concerning "the practical implication[s]" of its view, the consequences of properly applying Family Court Act § 1012 (a) and (g) should not affect our present reasoning inasmuch as the issue is one of jurisdiction. In any event, the majority identifies the remedy for its own concern: individuals falling outside of Family Court's limited jurisdiction are subject to ordinary criminal proceedings, including applicable orders of protection.